Case number 24-3044. United States of America v. Keith Berman, also known as Matthew Steinman. Mr. Giron for the appellants. Mr. Sachs for the appellee. Morning, counsel, whenever you're ready. Thank you. Good morning, and may it please the court, se Fernando Giron for appellant Keith Berman. At sentencing, the district court ruled that disclosure in this case occurred in December. That conclusion is legally flawed and factually erroneous. It is legally flawed because the district court read fraud disclosed to the market as fraud fully disclosed to the market. And it's also flawed because the district court assumed that the disclosure period could run only after the fraud period ended. Moreover, the conclusion is clearly erroneous because on April 23, 2020, the SEC undertook the extraordinary step of suspending trading in DECN stock. Just a month later, it issued a 12 page document that reads like an indictment and flat out accused DECN of disseminating false and misleading information in its press releases. These errors were consequential, Your Honor. An error-free guideline range here called for no more than 12 months in prison. The district court imposed a sentence seven times that length. I welcome this court's questions. I think you're understandably focused on this May SEC document as disclosing the fraud, but the district court expressly found that a core component of the fraud was your client's subsequent ongoing efforts to refute the SEC's disclosure. And essentially, that was a material ongoing part of the fraud that was not disclosed until the indictment. And I was a little surprised that it didn't seem you addressed that at all in your briefing. So I'm wondering on what basis you think we can say that determination is clearly erroneous or otherwise reversible error. Sure. The first thing that I'd like to point your honor to is the fact that the district court started from the wrong legal standard. It required full disclosure, even though the relevant provision doesn't say that. The second point that I'd like to say is that the modified recessory method, which this record applied here, it applies in cases involving the inflation, the fraudulent inflation and deflation of securities. We think that the inclusion of the word security here is key because we have to read the fraud against the backdrop of the securities fraud statute, particularly because that statute is the statute of conviction. Now that statute is all about, you know, making untrue material statements. And the public learned about that abundantly with clear notice, not in December for the first time, but in April and May. Right. And but in August, for example, there's the shareholder letter. There's ongoing comments on all of these forums to the relevant investing public where he's still essentially touting this blood test in the same way. And it's hard for me to say that's irrelevant when it seems accepted that those statements were also fraudulent. Well, your honor, I disagree. I think that really bears more on the obstruction count than it does on the fraud one. The fact of the matter is that the key, the heart of this case is securities fraud lies about the lied about that blood test was abundantly clear, not for the first time in December, but in April and April and May of 2020. Suppose we disagree with you about the cutoff dates. Do you have any further challenge based on the nature of proof of causation and reliance and damages? You invited use of this. What's it called? Recessory partial recessory method, which seems to um, allow for fraud on the market type inferences without a lot of individualized proof of shareholder reliance. Your honor, the district court under the guidelines, the district court had to measure the loss that resulted from the offense that imposes both above four and legal causation requirement. The district court didn't hold the government to in the United States versus Stein, a sister circuit considered what sort of evidence could establish, uh, you know, this causation. And it didn't say that you had to haul in every investor as endure pharmaceuticals, for instance. Um, but it did require much more evidence than what the called live witnesses. It could have performed an event study. What's wrong with what the government's expert did, which is you observe a very stark spike in the stock price, and then you run a regression to try to figure out if some other variable is might be driving that. And the answer is no. And so you attribute the increase in stock price to the fraud. That would be a complete event study, your honor. But Professor Mitz, who the government relied on below, didn't purport to do that. Uh, Professor Mitz said that he couldn't move on to the second phase of an event study. So it, you know, that's just not the evidence that, uh, the government had used, which in Stein, too, in the 11th Circuit was found to establish circumstantial evidence. So even on that record, we fall beneath the threshold amount of evidence that the court required in Stein. In Stein, the government undertook to prove investor specific reliance. Is your position that that is necessary for purposes of this guideline calculation? No, your honor. You know, our position is that, uh, as, as a Stein court held, it could adduce that sort of investor specific information the government could, or alternatively, it could establish circumstantially that inverse that investors relied. But the methodology used by the district court by the government's expert established only that DECN was not responsive to news about the broader market in the year before this. But of course, the year that we're talking about is a year 2020 with stock prices falling through the floor. Actually, in 2020, the S&P 500 grew by 18%, your honor. And that was even more true. That growth was even more rapid for, uh, you know, companies involved in biodiagnostics, which DECN had been doing for, you know, decades. Can you be more precise about what exactly you think is missing from the expert testimony? Because it, what's in the record is a chart. And my understanding was that he testified that he ran a regression as against biotech indexes and found that this price rise was not correlated with any broader changes in the market, which seems to be exactly what happened in Stein too. So what exactly is missing? The first part of an event study is what Professor Mitz did. But he conceded at, you know, in, at this recording in testimony that he could not complete the second phase of the study. So at the very minimum, we would have the, you know, we would have to have Professor Mitz or the government's expert complete that second part of the study and at least call live witnesses or who could establish that they heard fraudulent misstatements, that they relied on them, that their investor behavior was shaped by those statements. So you do think that the government had to put on evidence that each individual investor knew of and relied on the statements? It didn't have to, but it would help it to clear the threshold, which it, which it failed to do with the evidence it presented. Thank you. You done? You have anything else? No, thank you. Thank you. Mr. Sachs. You want to raise that? Doesn't appear to be working, but maybe I'm clicking the wrong thing. Sorry. May it please the court, Ethan Sachs on behalf of the United States. I just want to make a couple of quick points along the lines that your honors have been discussing with my colleague this morning. The first point I'd like to turn to is the actual loss amount finding that the district court made. I think Judge Garcia, your point hit exactly right. That a core component of this fraud the district court found was the obstructive efforts, the campaign, what the district court called an extraordinary efforts to undermine the efficacy of the SEC's notices. And what the district court actually said on page 511 of the appendix, which we think makes very clear, it did not adopt this rule of needing full disclosure in every case. It says, quote, in the normal case, an SEC notice like this probably would, it goes on to say, suffice, you know, to constitute disclosure. The problem here is just that Mr. Berman's obstructive efforts undermine. Yeah, substantially undermine that. A second point, just to respond to the point that those efforts were related to the obstruction count. We don't think they are at all. The obstruction count I have in the indictment makes very clear it's count two, it's false statements to the SEC. And it says on or about October 9th, 2020 in a matter within the jurisdiction of the executive branch. And it refers to Mr. Berman's making false statements before the SEC. So this is an October 2020. Those are not, that's when he was being interviewed by SEC investigators and lied to them. That was not the fraudulent activity that he was engaged in. When they say the district court required the fraud to be fully disclosed, one way of putting your argument would be the district court said it has to be, you know, materially disclosed. Is that how you would put it? Is there a better way? So I think your honor is correct. The district court did not use the explicit word material. We don't think that necessarily 2B1.1 needs to have a materiality standard. We think maybe a better word might be meaningful disclosure if you wanted to sort of qualify the word disclosure. And we think that that aligns very clearly with what happened here. I mean, I think at a minimum, when a core component of the fraud has not been disclosed to the public, it's really defies common sense to say that the fraud has therefore been disclosed to the public. We think at a minimum, that's a good test. So with meaningful disclosure, it seems to me that what you're getting at is effective disclosure. Well, I don't know if it necessarily needs to be effective. I think it's... Well, I think... So could the disclosure come in the form of the private conversation with the SEC rather than something public? I think very unlikely that a private conversation with the SEC... Right. And I think that the only point I was... I think you're right, Your Honor, that it is effective. It's effective upon sort of that we view the average member of the market. The key here is that it's disclosure to the market, the average person. And we think, yes, I think actually when disclosure is effective upon an average person in the market, sort of an objective, rational person obtaining that information, then it would constitute disclosure. The other part of it, though, is that it needs to be meaningful disclosure too, right? Here we have this complication, let's say, of the unknown number of investors who purchased based on the saliva test supposedly in development rather than on the fraudulently advertised blood test. Well, I think the district court directly addressed that and said there are a few individual people who Mr. Berman put forward may have been motivated to purchase stocks based on false statements regarding saliva. He produced a few. Sure, yes, but that's all... How many are out there? I suppose with certainty no one knows exactly how many investors, but I think the modified based approach, and so I suppose it is theoretically possible without further work. But cutting back on that is the fact that Mitz, our expert, did conduct really thorough regression analyses that looked to biotech stocks specifically, and the district court questioned him directly and provided explanations that the district court found was thorough and credible for why external forces, which would include false statements about the saliva test, did not cause the loss here, that the statements regarding the blood test were directly aligned temporally with the stock price's increase. What is the second step of the event study that Mitz did not... I remember he said it was impractical. What was that? I'm not certain about what the second step was, Your Honor. I apologize. But from our perspective, he conducted the entire regression analysis of everything that was necessary. He did say there was something, some aspect he couldn't do. I don't remember, but it's because it was confined to a particular company or something. Well, from our perspective, he looked at the market that he needed to look at, the entirety of the market. He conducted the entire... And the district court did not find that it was an incomplete analysis. The district court specifically found that his analysis was thorough and credible, especially as compared to Mr. Berman's expert. And I think it's just helpful context. This doesn't come in a vacuum. There was a hearing at which the district court judge was personally engaged in questioning both experts and really going through their theories with them. And sorry, on the regression, how did he disentangle the fraudulent statements from saliva test? Well, I don't... Well, so I think it wasn't just a saliva test specifically. I think he looked at it through all external market factors. No, I know, but you put saliva test in the pocket of... In that case, yes. Yes, sure. ...potentially confounding variables that have been accounted for. Yes, so... So how does... I get how you do that for S&P or biotech indices. How do you do that for  Well, I'm not an expert myself, but... I think the point is that what he did for the saliva test, the most poignant point was that the timing, the temporal proximity for the statements specifically addressing the blood test, that the bell curve chart that Your Honor mentioned earlier, which is at Supplemental Appendix 362, shows extremely tight temporal proximity between the statements regarding the blood and spikes in the price of the stock. So I think that is the portion of the regression analysis that's most likely addressed to the other... Well, there's a spike in July, and the statement about the saliva test is July 10th. So it does seem like an issue that he did not specifically address saliva in any way explicitly. You're not... I do not believe the expert ever explicitly addressed the saliva test. I think the expert tracked the stock price over a long period of time. And I agree there is a slight spike in July, but I think in general, the general trend of the bell curve, if you will, really tracks exactly when Mr. Berman started making statements about blood, and then it drops exactly when the indictment is disclosed. I'm not sure this is... This may be harmless error in this case, but I have a question about the method, which is the rough way the method works is you figure out by how much the fraud inflated the stock price, and then you multiply by something.  And the something you multiply by is number of shares outstanding. Yes. I can't figure out, for the life of me, I can't figure out why that's the right measure, as opposed to number of shares traded. I mean, if you have a million shares outstanding and nobody trades, nobody's harmed. It's the people you care about are the people who bought securities during the fraud period. No? I take your honor's point. I think that they're... But I do think the modified rescissory method, which is, again, what the guidelines recommends as a method to use, and both parties here specifically, just to clarify, proposed it being used. I think it doesn't necessarily capture the sales that occurred during the fraud period. But I do think it's not... When you're looking at a harm base to society as a whole, and the stock is rising and then falling, people who own that stock, I think it did go up and they purchased it. To be clear, it includes members who purchased the stock during the period. It's not like they're not considered in the modified rescissory method. But I think people who had the stock before, and it goes up, and it's basically... The record shows, for many people, their life savings that are then completely lost down to zero. It is a huge loss for them, whether they've sold the stock or not. I understand that the loss is not felt necessarily, or final, until they've sold the stock. But I don't think it's unreasonable on a market-based spectrum to consider them too as suffering. I'm not sure. Every day, they decided not to sell, as they saw the price mounting. So holding is as good as buying, as far as that's... In terms of reliance. Well, respectfully, Your Honor, I think every day they held because they were being manipulated. I understand that, but they didn't trade. They weren't buying on that day. They were holding on that day. They're just as affected as somebody who bought on that day. And as a mathematical matter, I understand Your Honor's point. That's why, at the end of the day, when the stock goes to zero, they lose everything too. Yes. All right? And indeed, if it went literally to zero, suddenly, there would be no sales available to them. It would be too late. I think that's correct. I do say that I don't think it could be a clear error for the district court to rely on the method that both parties proposed and that the guidelines themselves recommend. Okay. In your view, if you effectively carry out the modified rescissory method, does that satisfy whatever reliance requirement there is? Or is there something else the government needs to show to show that folks actually were aware of these statements? I think as long as the modified rescissory method, as it was in this case, is understood to require effectively a regression analysis to make sure that external factors are not causing the loss, which our expert did here, I think that is sufficient to show that it's above forecast. I think a helpful way of thinking about it is what the Ninth Circuit said. It addressed a similar issue in Berger. And if Your Honor can give me just 30 seconds, I can read the quote that I think is most helpful from there. And that says, where the value of the security has been inflated by a defendant's fraud, the defendant may have caused aggregate loss to society even if various individual victims' respective losses cannot be linked to the fraud. So we think that's really the general standard. And we think if the modified rescissory method is applied correctly, including a regression analysis to exclude external factors, that's sufficient. The defendant in this case agreed to the rescissionary method, correct? Yes. OK. So is his agreement necessary in order for the court to use it? No. I think the court has discretion under the guidelines. And in fact, the guidelines, I don't want to misquote it, but it says something along the lines, you can use any method that is practicable in the circumstances. And this method says you have to come up with a, so long as it's a reasonable estimate? Yes. That's the standard for... So, I mean, signing on is good enough for government work in a criminal case. I mean, the defendant signed on for it. Otherwise, I think it would be extremely troubling. I agree that the defendant signed on. OK, he signed on. Yes. OK, thank you. Thank you very much. Ronald? Thank you. I'd just like to address a few points. One relates to the standard that my friend advocated for. Materiality or effective or has a consequence in the market. I think that's to confuse the effects of disclosure with disclosure itself, right? To disclose is to reveal or make something known or public that wasn't known before. Galileo, for instance, disclosed that the earth orbited around the sun, even though ecclesiastic authorities disbelieved them at the time. You don't think disclosure can be a question of degree? How much is good enough? I do, Your Honor, but if we focus on what the fraud is, which is that which has to be disclosed to trigger the disclosure period. The fraud here is securities fraud. It's lying about the blood test. And that makes sense because those are the lies that got people to buy DECN stock. And so the relevant disclosure period should be triggered when those lies are revealed. That happened in April and May 2020. The SEC never withdrew any of its notices in response to the obstructive conduct. And I'd just like to say that. They suspended trading and then dropped the suspension, correct? Yes, Your Honor, that's standard in SEC. It's almost always a temporary suspension. But, for instance, it never withdrew. They suspended it to see if it can reach a firm conclusion that the stock should not be resumed. Trading should not be resumed. We couldn't reach that, so they allowed it to resume. Yeah, friends, the SEC never withdrew, for instance, its May 20th document, which was issued to the public, which mirrors the indictment and also reads like an indictment. I'd just like to say one last thing. To the extent that this court is worried about maybe some of the bad policy effects of encouraging obstructive conduct to minimize loss amount, I would say that it needn't have that concern. If the government knows that its first disclosure is going to be the one that triggers the disclosure period and it's concerned that obstruction will defeat that disclosure, then it has a really good incentive to make that disclosure early, rapid, strong, and fulsome. We think that's a feature and bug of our proposed rule that the government would miss out on. Can I ask you to... What was the second step in the event study you said Mintz did not do? I remember he's acknowledging he didn't do something. Yes, Your Honor, I'm not an economist, so I don't really understand terribly well what the second step involves. I know that Professor Mintz didn't do it, and that's what the Stein court in Stein 2 found was sufficient. Just one question. We had some questions about the saliva test, and I would just like to hear you address it. This argument would be far more material if what that release on July 10th said was, we are abandoning our blood test. We are only now pursuing a saliva test. But instead, what it says is, we're adding a second great thing. We continue to tout both of these blood tests, both of these tests. And the district court effectively said, well, you really just can't disentangle those. You do have one or two victim impact statements. But what is your best argument that that's a material change in the nature of the scheme when they still continue to tout the blood test? Well, Your Honor, I don't think that any press releases after July mentioned the blood test. I'm not entirely sure about that, but I think that's true. His comments and the shareholder letter that he organized anonymously both continue to tout the blood test. Right. Well, he was defending himself against the SEC investigation. That's certainly true. Now, with respect to the saliva test, the government has never said, bless you, Your Honor, that—is that weird for me to say bless you? The government has never said that the saliva, the efforts to develop the saliva test were fraudulent. And so if people bought that, if people bought the ECN stock because they thought, oh, boy, they've come out with this really good test, then actually the government's proposed rule really overstates the fraud because investment enthusiasm had to do more with the saliva test and not with the fraud, which we have to isolate when we're calculating loss amount under the modified arrest story method. Okay. Thank you. Thank you. Thank you, counsel. Thank you. Case is submitted.
judges: Katsas; Garcia; Ginsburg